NO. 4-08-0799          Filed 11/10/09

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| TOM GEISE PLUMBING, INC., an Illinois Corporation, | ) ) | Appeal from Circuit Court of |
|     Plaintiff-Appellant, | ) | Adams County |
|     v. | ) | No. 08LM111 |
| PATRICK TAYLOR and ROBIN TAYLOR, | ) | |
|     Defendants-Appellees. | ) ) ) | Honorable Thomas J. Ortbal, Judge Presiding. |

JUSTICE MYERSCOUGH delivered the opinion of the court:

In May 2008, plaintiff, Tom Geise Plumbing, Inc., an Illinois corporation, filed a complaint against defendants, Patrick and Robin Taylor, seeking monetary damages for defendants' failure to pay plaintiff for plumbing work plaintiff performed. In June 2008, defendants filed a motion to dismiss, arguing plaintiff violated the Home Repair and Remodeling Act (Act) (815 ILCS 513/1 through 999 (West 2006)). In September 2008, the trial court (1) granted defendants' motion to dismiss and (2) denied plaintiff's motion to supplement the evidence. We reverse and remand.

I. BACKGROUND

On May 15, 2008, plaintiff filed a complaint alleging defendants had failed and refused to pay plaintiff for plumbing services provided by plaintiff to defendants in the amount of $11,251.49 for work completed on defendants' building at 614 through 618 Maine Street in Quincy, Illinois. The building at 614 through 618 Maine Street is one building with three commercial storefronts. Plaintiff attached its proposal-estimate,

which was unsigned by either party, to the complaint. The proposal estimated the work would cost between $4,800 and $6,300. The proposal stated "[a]ny alteration or deviation from the above specifications involving extra costs will be executed only upon written orders, and will become an extra charge over and above the estimate." Exhibit B, also attached to the complaint, was the itemized invoice plaintiff sent defendants for all of the work completed. The invoice totaled $11,251.49.

On June 24, 2008, defendants filed a motion under section 2-619 of the Code of Civil Procedure(735 ILCS 5/2-619 (West 2006)) to dismiss. The motion did not specify under which subsection defendants were proceeding. Defendants alleged the following: (1) at all relevant times, they resided at 614 Maine Street in Quincy, Illinois; (2) their residence is a single-family dwelling; (3) the work set forth in exhibits A and B constitutes home repair and remodeling as defined by the Act; (4) plaintiff failed to comply with the Act by not (a) providing a written contract stating the total cost (815 ILCS 513/15 (West 2006)), (b) obtaining a signed contract or purchase order from defendants prior to the commencement of work or charging for the remodeling or repair work (815 ILCS 513/15, 30 (West 2006)), and (c) providing defendants with a consumer rights brochure (815 ILCS 513/20 (West 2006)); and (5) plaintiff's failure to comply with the Act's requirements precluded plaintiff from recovering on its breach-of-contract claim.

Both defendants submitted an affidavit in support of their motion to dismiss. Defendants' affidavits stated that at all times referenced in the complaint they resided at 614 Maine Street in Quincy and the residence was a single-family dwelling. Defendants discussed the renovation and repairs with a representative of plaintiff and

received a copy of the estimate that was set forth as exhibit A in the complaint. Defendants were never asked to sign the estimate, nor did they witness a representative of plaintiff sign the estimate prior to performing the work or billing defendants for the work performed. Moreover, the estimate was the only written document regarding the work to be performed that defendants saw prior to the commencement of the renovations and repairs. Defendants each denied that plaintiff provided them a copy of the consumer rights brochure as required by section 20 of the Act (815 ILCS 513/20 (West 2006)).

On August 7, 2009, plaintiff filed a response to defendants' motion to dismiss. Plaintiff attached the affidavit of Tom Geise, plaintiff's owner, as exhibit A to plaintiff's response to the motion to dismiss. Plaintiff stated the photographs attached to the affidavit clearly show 614 Maine Street in Quincy is a commercial structure where one unit is an art gallery, a second unit is an art school or studio, and the third unit is available for commercial lease. Plaintiff also stated the Act does not apply to original construction of single- or multiple-family residences. Plaintiff maintained that at the time work on defendants' property commenced, the area in question was unoccupied and was being used for the sole purpose of storage. Moreover, plaintiff maintained section 15 of the Act only requires a written contract to be furnished prior to the commencement of work, not that it actually be signed. Further, according to plaintiff, the parties had an extensive history of past dealings with one another regarding work performed by plaintiff on properties owned or controlled by defendants and at no time during these dealings was it the course of conduct of the parties to have a signed contract.

Geise's affidavit stated defendants asked his company to prepare a

3

proposal for various plumbing work at 614 Maine Street, the majority of which was to be performed on the second floor of the structure. Prior to making his proposal, Geise inspected the property and found the second floor was not occupied and was being used as a storage facility. "Based on [Geise's] observation, it was clear to [him] that this space had been used exclusively for storage or commercial purposes (i.e., a dance studio) for a number of years." Geise prepared an initial proposal for the work to be performed and submitted it to defendants. Defendants instructed Geise, as agent for plaintiff, to begin work in accordance with the proposal. After work began, defendants "made numerous requests that additional items and additional work not contemplated by the original proposal be supplied." Plaintiff informed defendants that they would be charged for labor as well as the materials associated with defendants' additional requests and the final cost would be more than what the original proposal stated. The affidavit further stated that plaintiff had performed work for defendants on at least six separate occasions and at no time during any of the parties' past dealings was there a signed contract between plaintiff and defendants. Finally, Geise's affidavit states that he personally examined the property in question and "currently, the lower level is occupied by an art gallery, and art studio[,] and a third unit is marked as being for lease." Based on Geise's "personal observation, the upper level of 614 Maine Street was completely [un]inhabitable prior to the commencement" of plaintiff's work. Moreover, any of the plumbing fixtures that plaintiff installed "were of a commercial as opposed to residential character."

On September 3, 2008, the trial court held a hearing on defendants' motion to dismiss. Robin Taylor testified she lives at "614 through 618 Maine Street."

4

Robin stated she and her husband purchased the building that includes 614 Maine Street in 2003 for the purpose of living in the upstairs of the building and renting the three retail spaces on the first floor. According to Robin, they lived there for a couple of years and then bought another building at 938 Maine Street and moved into it for about two years before moving back into the building at 614 through 618 Maine Street in March 2007. When defendants moved into the building at 938 Maine Street, they moved their beds and other belongings there but kept some belongings at 614 Maine Street.

Originally, defendants were going to reside on just the third floor. However, after the dance studio that had been renting the second floor moved out, defendants decided to live on the second floor as well. They had an architect design the third floor, and Robin discussed with a building contractor how she wanted the rooms on the second floor to be done.

In October 2007, defendants contacted plaintiff. Geise and a female employee of plaintiff came to view the property. Robin "walked them through the space and told them what [her] plans were for the kitchen, the bedrooms, the bathrooms, and what [Geise] was to be doing. And [they] also wanted to put a bathroom up on the third floor." Robin explained to Geise and the other employee that defendants were living there. Her "bed and everything was there when he went through." Later on, she testified their bedroom, living room, and dining room furniture were all there during this walk-through. In November 2007, Geise and another employee, Kevin, did another walk-through with Robin. Geise gave her the proposal at this walk-through.

Robin identified exhibit A as the proposal Geise gave her. Listed on

exhibit A were a kitchen sink, whirlpool bathtub, and a washer hookup. Defendants were never asked for a signature before plaintiff started work. Moreover, neither Geise nor a representative of plaintiff gave defendants a pamphlet entitled "Home Repair: Know Your Consumer Rights." The proposal estimated the cost of the work to be between $4,800 and $6,800.

On cross-examination, Robin stated there were three different addresses for the building because there were three commercial rental units on the ground floor. The second floor was being used as a dance studio when defendants purchased the building in 2003, and this continued until late 2006. The second floor had a bathroom with two stalls. Defendants' daughter uses one and their son uses the other. The third floor was not being used when defendants bought the building. The second level was just wooden floors with an open space, and the third floor was open space with the exception of one panel wall. There was no shower or bathtub on either the second or third floor in October 2007 when plaintiff's representatives did the initial walk-through with Robin. Defendants had been showering in the shower that had been installed behind the art gallery on the first floor. The estimate in the proposal was based on plaintiff installing one lavatory, one washer hookup, one whirlpool bath, and one stool. Robin did not know why the proposal only stated there would be one toilet because they had discussed installing four toilets. Ultimately, plaintiff installed four toilet hookups. Robin acknowledged either she or her husband contacted plaintiff and instructed them to start work in late November 2007.

Robin stated Jeremy Turner was the building contractor defendants hired to put up walls. Turner began work in November 2007. At the time Geise gave her the

proposal, Turner had not begun putting walls up yet.

Geise testified he is president of plaintiff corporation and has been involved in the plumbing business for nearly 40 years. Defendants contacted plaintiff in October 2007. Geise had heard of defendants but did not know them personally. He thought his son, who works for plaintiff corporation, had done work for them before. To Geise's knowledge, none of that work was at 614 Maine Street.

When Geise met Robin at the building for the first time, Robin took him to the basement. They "started off down in the basement trying to find where the sewer lines [were] so we could hook on to the sewer. She wanted to put a bathroom upstairs on the second floor." Geise stated defendants were living in the back of one of the ground-level units. Geise believed Patrick and the children were on the first floor while Robin was showing him around.

According to Geise, the second floor was a wide-open space. It had a mop sink and stool. The mop sink was similar to a janitor's sink, and it was constructed of fiberglass. Robin had an old wall-hung cast-iron sink getting refinished that she wanted to use. Geise did not observe any beds on the second floor during this first visit. Geise also stated he did not observe any walls that had been installed or a couch or television at this time. He could not say whether there was electricity because they did not need to turn it on since there was plenty of light coming through the window. Based on what he observed, Geise stated nobody was living on the second floor the first time he visited the building. The third floor was wide open as well, and nothing was up there other than a child's battery-operated car.

Geise stated the bid called for installing a bathroom on the second floor.

˘ 7 ˘

This involved putting in a stool, a bathtub, and a lavatory.  None of these items were on the second floor the first time he looked at the building.  There was not a water heater on the second floor either, but the bid called for installing one.  There was no plumbing on the third floor at the time of this meeting.  However, there was a vent stack running up from the floor below to the roof.  A vent stack lets sewer gases escape from the pipes.  Robin wanted to put a sink and a stool on the third floor.  The bid also contemplated a hookup for a washing machine on "the main living floor."

On cross-examination, Geise was asked whether his understanding during the first walk-through was that defendants were going to be living there.  Geise stated "I believe that's what she said she was gonna do."  Geise acknowledged that the items Robin was asking to be installed were consistent with residential plumbing.  Geise also acknowledged he was not aware of the Act.  Geise stated he never provided defendants with a copy of a brochure entitled "Home Repair: Know Your Consumer Rights," nor had he ever provided an individual that he had done work for with a copy of the brochure.

Geise stated he usually signs the proposals before submitting them to potential customers.  He acknowledged the copy of the proposal attached to his complaint was not signed by him.   Geise could not recall the dates of either the first or second walk-through.

On redirect, Geise stated that based on his observations, nobody was living on the second or third floor.  Defendants were living in a unit on the first floor.

Candy Maas is employed with plaintiff as a secretary.  She types up bids and bills.  Geise prepares the bids, brings them to Maas, and Maas then looks them over and types them up.  Geise usually signs them, and then they are mailed to the

customer. The bid submitted to defendants was mailed.

Maas accompanied Geise to 614 Maine Street for the first walk-through. Robin met them there and showed them the building. The first floor was being used as a haunted house at the time. The second floor just had a bunch of items lying around. "There were clothes piled up. There were shoes. Just a bunch of stuff laying [sic] around." There was no kitchen on the second floor. Maas recalled seeing a washer and dryer but could not recall whether they were hooked up. The proposal called for hooking up a new washer and dryer in a different location from where the ones Maas saw on the day of the first walk-through were located. Maas could not recall seeing other fixtures that were hooked up. Maas saw other fixtures that were not hooked up such as "one or two old cast iron sinks, the long drainage, the long cast iron sinks of a kitchen." Maas did recall seeing at least one bed. Other furniture was on the second floor "but stuff was piled" on it. Maas could not see how anybody could be living on the second floor "[b]ecause of all the stuff piled up" and because it is "kind of hard to live somewhere without a kitchen." There was one wall back in the corner by the stairwell that led upstairs. Like Geise, Maas stated she did not know if the electricity worked on the second floor because there was no need to turn the lights on since the sunlight coming through the windows was sufficient to light the room. There were no curtains on the second-floor windows. The second floor did not have a shower, bathtub, refrigerator, stove, or a closet where clothes were hanging.

The third floor "was a big open area. There was a desk over in the corner with some shelves there. On the other side there was, looked like a collection of Halloween *** stuff." It did not appear to Maas as if anybody was living on the third

floor.

Kevin Geise has been employed by plaintiff since 1991. Kevin went with Tom to look at 614 Maine Street in November 2007. Some walls were being built but not enough so that they could "even start plumbing." Kevin stated "[i]t looked like somebody was trying to live there. I don't know if they were or not. There was one toilet, and I think there was a mop sink. *** I took my brother down there that was gonna do the job, and that's when the carpenter said, well, that toilet's in the way. You got to get rid of it, and that sink." They "capped" everything off. There was not a toilet there for a week or so.

Kevin did not see a kitchen, refrigerator, or stove on the second floor. When asked if he had seen a bathroom on the second floor, Kevin stated "I guess you could classify it as a half bath with a toilet and a sink. But there's no bathing facilities."

Kevin saw a half bath and a kitchen on the first floor. However, to see the kitchen, Kevin said they had to go next door to a building that Kevin identified as exhibit 1-E.

When asked if the second floor was habitable in his opinion, Kevin stated that he "wouldn't raise [his] kids in there with no toilet, with no shower or anything like that, especially as young as [defendants'] kids are, and running around there." There was no kitchen on the second floor. The stove and kitchen sink were not hooked up. Everything was piled up, the sink and stove were just lying there. "[T]heir stuff might have been there, but you couldn't classify it as a kitchen because there was no sink, there was [sic] no drains, no water lines."

There was nothing on the third floor. "The third floor had, had ceiling joists

and everything cut out, and there was nothing there." Kevin thought there may have been a desk in the back corner. Defendants said they wanted a half bath up there and then changed their minds and wanted a full bath. "[T]here was a whirlpool tub up there, but it was still in the crate and there was no way that anybody ever used it." The tub looked like it had been there for a few years because of the dust, but it was "brand new in the crate."

On cross-examination, defense counsel asked Kevin "was it your understanding that you would be doing work that would be a residence for someone as opposed to a commercial job?" Kevin responded, "Yes, it was going to be a residence."

On redirect, Kevin stated that at the time he started the job, he would not have classified 614 Maine Street as a residence. There were no walls around the toilet, "it sat out in the middle of the back room."

On rebuttal, defense counsel recalled Robin to the stand. Robin stated that 614 Maine Street was the only place she had resided from March 2007 until the date of the hearing. Patrick and the children had not resided anywhere other than 614 Maine Street during this time period either. After one of defendants' children was born on December 5, 2007, Robin "stayed downstairs because the hot water was downstairs, but that was just [Robin]." The first floor had a toilet and sink in the bathroom. "There's a shower and kitchen set-up." Robin could have cooked in the kitchen, but she stated they mostly went out to eat.

Robin stated the second floor contained the mop sink and toilet. She said the toilet was walled in at the time.

On cross-examination, Robin stated there was never hot water or a

shower on the second or third floor between March 2007 and December 2007. When asked if there was ever a stove or refrigerator on those floors during that same time period, Robin stated there was a small refrigerator for storing drinks. No stove was hooked up on the second or third floors during that time period.

Timothy Geise is employed by plaintiff corporation. Timothy did most of the plumbing work on the second and third floors of 614 Maine Street in late 2007. Timothy stated that when he commenced work, there was a stool and a mop sink on the second floor that was immediately removed. The walls were framed, and he was supposed to start roughing in all the new fixtures. There was not a kitchen on the second or third floor. No bathroom existed on the second or third floor after the toilet was removed. Defendants told Timothy they used a bucket for handling waste during the several days between when the toilet was removed from the second floor and the new one was installed instead of using the toilet on the first floor. Moreover, to get to the bathroom on the first floor, one would have to go outside and "go around the second storefront to get into a place to use the bathroom." There was also a bed, stove, and shower on the first floor.

On cross-examination, defense counsel impeached Timothy with his previous conviction for possession of cannabis and another unidentified felony conviction.

Timothy first met defendants at the beginning of January 2008 when he began work on 614 Maine Street. The job took him about three weeks to complete.

The parties then presented their arguments to the trial court. Defense counsel argued plaintiff violated the Act by not (1) providing defendants with the

pamphlet and (2) obtaining defendants' written signature on the contract for the work to be performed. Defense counsel also stated it was undisputed that the work was "a remodel of an existing structure." Counsel argued the building was defendants' residence and the Act was applicable to the work done there.

Plaintiff's counsel argued that this situation does not fall under the Act because the evidence showed the second and third floors of 614 Maine Street were not a family dwelling. Instead, counsel argued the work being done changed "the inherent purpose of the building from one purpose to another." Therefore, the work was "more akin to original construction" than it was to remodeling, "which is the purpose of this particular [A]ct."

The trial court concluded plaintiff did not comply with the Act because plaintiff failed to (1) obtain a signed contract before beginning the work and (2) provide defendants with a copy of the brochure required by section 20 of the Act. The court also found "the defendants were occupying this property as a residence. They intended to use it as a residence." The court then reserved ruling on the issue of whether the property was "primarily" designed or used as a residence.

On September 4, 2008, the parties requested that the trial court reserve ruling pending settlement discussions. The court set the case for status review on September 23, 2008.

On September 15, 2008, plaintiff filed a motion to supplement the evidence. The motion stated that testimony from the hearing on defendants' motion to dismiss "indicated that a kitchen unit, shower, sleeping, and hot water facilities were located on the first floor of the building." Plaintiff attached an affidavit from Judy Maas,

Quincy's zoning administrator, "which verifies that 614 Maine, Quincy, Illinois[,] is designated as 'commercial.' *** The first floor of a commercial building may not be used as a residence without a special use permit." According to the motion, defendants never obtained a special use permit. Moreover, 614 Maine Street has only one water meter for the entire building, and Quincy classified the account as a commercial account. The motion states that "[t]he foregoing evidence establishes that at the time [plaintiff] commenced work for the [d]efendants, the primary use of 614 Maine was for commercial purposes."

In a written order dated September 30, 2008, but file-stamped October 1, 2008, the trial court denied plaintiff's motion to supplement evidence and granted defendants' motion to dismiss.

With respect to plaintiff's motion to supplement the evidence, the trial court stated the following:

"[T]he [p]laintiff did not satisfy the court that the evidence could not have been obtained and introduced at the time of the hearing on the [m]otion. The [m]otion to reopen the evidence is essentially made after the court made findings regarding the [d]efendants' actual use of the second floor of the building as their residence. The [p]laintiff has not shown that the proposed new evidence is of the utmost importance to the presentation of its case or the defense of [d]efendants' motion to dismiss. The proposed evidence would establish the zoning classification of the building and the

˅ 14 ˅

representation by the city zoning authority that the first floor of the premises could not be occupied as a residence without obtaining a special permit from the city. The [d]efendants did not contend that they occupied the first floor as their residence. They did contend that they used a shower and bathroom located on the first floor in conjunction with their use and occupance of the second floor as their residence. Based on the foregoing factors, the [p]laintiff's [m]otion to supplement or reopen the evidence is denied. (See, General Motors Acceptance Corp. v. Stoval (2007), 374 Ill. App. 3d 1064, 872 N.E.2d 91.)"

Next, the trial court's order addressed defendants' motion to dismiss. Quoting section 10 of the Act (815 ILCS 513/10 (West 2006)), the court noted that the Act states "'Home repair and remodeling' means the fixing, replacing, altering, converting, modernizing, improving, or making of an addition to any real property primarily designed or used as a residence." (Emphasis in original.) The court noted that "home repair and remodeling" includes the construction, installation, or replacement of kitchens and bathrooms, among other things. See 815 ILCS 513/10 (West 2006).

The trial court reiterated its conclusion that the work provided by plaintiff included installing kitchen and bathroom fixtures for defendants in the premises they "used and intended to use as their residence." The court stated the building in question was not primarily designed as a residence but "the plain language of the Act includes, in

the alternative within the definition of home repair and remodeling, improvements to any real property 'primarily *** used' as a residence." The court concluded the evidence established the primary use of the building was residential use. While there was evidence the first floor was occupied "by some form of commercial retail use," the evidence showed "the second floor was and had been occupied by [d]efendants for nearly two years as a 'loft' residence. The evidence was virtually unrebutted that the [d]efendants' living room, dining room[,] and bedroom furnishings were located on that floor." The court then again stated its finding "that the real property in question was primarily used and intended to be used as a residence at the time the [p]laintiff was engaged to install the kitchen and bathroom fixtures."

Next, the trial court addressed plaintiff's argument that the installation of the kitchen and bathroom fixtures constituted "original construction." The court noted that the Act's requirements do not apply to "original construction" of a residence. The court rejected plaintiff's arguments and stated the following:

> "[T]he court in interpreting this Act should give the language
> its plain and ordinary meaning, reading the Act as a whole.
> Although the bathroom and kitchen plumbing work
> performed by the [p]laintiff apparently did not involve fixing,
> or replacing existing bathroom and kitchen fixtures, the Act
> specifically defines 'home repair and remodeling' as
> including 'construction' and 'installation' of 'kitchens' and
> 'bathrooms.' The construction and installation performed by
> [p]laintiff was to an existing structure. In viewing the Act in

its entirety the court interprets the exemption language for 'original construction' to mean construction of a dwelling or residence on previously vacant or unoccupied property."

Therefore, the court found the Act applied to the work, and to the contract between plaintiff and defendants, and dismissed plaintiff's complaint.

This appeal followed.

## II. ANALYSIS

Plaintiff raises two arguments on appeal. Plaintiff contends the trial court erred by (1) granting defendants' motion to dismiss and (2) denying plaintiff's motion to supplement the record.

As stated, plaintiff contends the trial court erred by granting defendants' motion to dismiss. While defendants' motion to dismiss does not specify what subsection of section 2-619 they intended to proceed under, the parties and trial court seem to have proceeded under section 2-619(a)(9), which permits involuntary dismissal where "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2006). "'[A]ffirmative matter,' in a section 2-619(a)(9) motion, is something in the nature of a defense which negates the cause of action completely." Illinois Graphics Co. v. Nickum, 159 Ill. 2d 469, 486, 639 N.E.2d 1282, 1290 (1994). "[W]e review the grant of a motion to dismiss under section 2-619 on a de novo basis." Lykowski v. Bergman, 299 Ill. App. 3d 157, 164, 700 N.E.2d 1064, 1070 (1998).

The Act is intended to (1) increase consumer confidence, (2) reduce the likelihood of disputes, and (3) promote fair and honest practices by improving

communications and requiring accurate representations between people engaged in the business of making home repairs and remodeling and their consumers. See 815 ILCS 513/5 (West 2006). Prior to beginning home repair or remodeling work that will cost the consumer over $1,000, the contractor must "furnish to the customer for signature a written contract or work order that states the total cost, including parts and materials listed with reasonable particularity and any charge for an estimate." 815 ILCS 513/15 (West 2006). "It is unlawful for any person engaged in the business of home repairs and remodeling to remodel or make repairs or charge for remodeling or repair work before obtaining a signed contract or work order over $1,000 ***." 815 ILCS 513/30 (West 2006). Moreover, a person engaging in home repair and remodeling is required to furnish the customer a copy of the pamphlet entitled "Home Repair: Know Your Consumer Rights" and obtain a signed acknowledgment from the customer acknowledging that he received the pamphlet. 815 ILCS 513/20 (West 2006). It is undisputed that plaintiff did not (1) sign the written contract or obtain defendants' signatures on the written contract as required by section 30 of the Act or (2) provide defendants with the consumer rights brochure as required by section 20 of the Act.

Plaintiff contends the Act does not apply to the facts of this case because the Act (1) only applies to real property primarily designed for use as a residence and (2) does not apply to original construction.

This court has stated the following with respect to the rules of statutory interpretation:

"The primary rule of statutory interpretation and

construction, to which all other canons and rules are

subordinate, is to ascertain and effectuate the true intent and meaning of the legislature. [Citation.] In interpreting a statute, a court must give the legislative language its plain and ordinary meaning. [Citation.] If the language of the statute is plain, clear, and unambiguous, and if the legislative intent can be ascertained therefrom, it must prevail and will be given effect by the courts without resorting to other aids for construction. [Citation.]

However, the proper interpretation of a statute and determination of legislative intent cannot always be based upon its language alone. Where a statute is ambiguous and the legislative intent cannot be ascertained from the plain and ordinary meaning of its language, then the court is guided by the rules of statutory construction. [Citations.] Generally, the interpretation of a statute must be grounded on the nature and object of the statute as well as the consequences which would result from construing it one way or another. [Citation.] Legislative intent may be ascertained from the reason and necessity for the act, the evils sought to be remedied, and the objects and purposes sought to be obtained. [Citation.]" Village of Buffalo v. Illinois Commerce Comm'n, 180 Ill. App. 3d 591, 595, 536 N.E.2d 438, 440-41 (1989).

Only a few courts have interpreted the Act. Recently, in <u>Artisan Design Build, Inc. v. Bilstrom</u>, No. 2-08-0855 (September 22, 2009), __ Ill. App. 3d __, __ N.E.2d __, the Second District summarized these few cases as follows:

"In <u>Central Illinois Electrical Services, L.L.C. v. Slepian</u>, 358 Ill. App. 3d 545[, 831 N.E.2d 1169] (2005), the Third District of the Appellate Court held that section 15 of the Act unambiguously requires anyone, including a successor to the original electrical contractor, to obtain a signed written contract and furnish an estimate of reasonable particularity or lose its mechanic's lien rights. <u>Slepian</u>, 358 Ill. App. 3d at 548[, 831 N.E.2d at 1172]. <u>In MD Electrical Contractors, Inc. v. Abrams</u>, 369 Ill. App. 3d 309[, 859 N.E.2d 1070] (2006), this court addressed the question of whether the Act applies to subcontractors as well as contractors, and we concluded that it does not. <u>Abrams</u>, 369 Ill. App. 3d at 314-15[, 859 N.E.2d at 1075]. Next, the Fourth District decided <u>Smith v. Bogard</u>, 377 Ill. App. 3d 842[, 879 N.E.2d 543] (2007), in which the contractor's legal and equitable claims were defeated because the contractor failed to secure a written contract prior to initiating construction and failed to provide the owners with the consumer rights pamphlet. <u>Smith</u>, 377 Ill. App. 3d at 848[, 879 N.E.2d at 548]. Our supreme court

affirmed this court in <u>MD Electrical Contractors v. Abrams</u>, 228 Ill. 2d 281[, 888 N.E.2d 54] (2008).  The Fifth District in <u>Kunkel</u> declared that for a private right of action to exist under the Act for a failure to furnish the consumer rights brochure, the plaintiff must prove that the failure to provide the brochure proximately caused his damages.  <u>Kunkel [v. P.K. Dependable Construction, LLC]</u>, 387 Ill. App. 3d [1153,] 1160[, 902 N.E.2d 769, 776 (2009)].  The last court to consider the Act was the First District, which held in <u>K. Miller Construction Co. v. McGinnis</u>, No. 1-08-2514 (August 10, 2009), that the failure to provide a written contract does not preclude a contractor's recovery in <u>quantum</u> <u>meruit</u>, rejecting the contrary holding in <u>Smith</u>."  <u>Bilstrom</u>, slip op. at 11-12, __ Ill. App. 3d at __, __ N.E.2d at __.

The <u>Bilstrom</u> court then addressed the issue before it, <u>i.e.</u>, "whether the failure alone to provide the [consumer rights] brochure is a complete defense to all legal and equitable claims brought by the contractor."  <u>Bilstrom</u>, slip op. at 12, __ Ill. App. 3d at __, __ N.E.2d at __.  The court interpreted the language of the Act to mean that "a contractor's failure to provide the consumer with the brochure does not vitiate the contractor's right to recover either in equity or in law, but if certain requirements are met, the failure to furnish the brochure may give the consumer a cause of action under the Consumer Fraud and Deceptive Business Practices Act."  <u>Bilstrom</u>, slip op. at 15, __ Ill. App. 3d at __, __ N.E.2d at __.  However, the question presented here, whether the Act

applies to work done to a commercial building that is being partially converted to residential space, has not been answered by the appellate or supreme court.

We conclude the work performed by Tom Geise Plumbing, Inc., on this commercial building did not subject plaintiff to the requirements of the Act. The language of the Act shows the legislature did not envision that part of a commercial building being converted into a loft would fall within the scope of the Act. Section 10 of the Act defines "residence" as "a single-family home or dwelling or a multiple-family home or dwelling containing 6 or fewer apartments, condominiums, town houses, or dwelling units, used or intended to be used by occupants as dwelling places." 815 ILCS 513/10 (West 2006). This building does not fit within the above definition of "residence." The legislature gave specific examples of structures that can be residences, including single-family homes and dwellings and multiple-family homes and dwellings containing six or fewer apartments, condominiums, town houses, or dwelling units that can be residences, but did not include a commercial structure being partially converted as in the case sub judice. The legislature clearly did not contemplate the partial conversion of a commercial property to a mixed-use property. Moreover, the fact defendants slept in the unfinished open spaces of the second and third floors of this commercial building does not change the essential character of the building from commercial to residential.

Further, section 10 of the Act provides that "'[h]ome repair and remodeling' means the fixing, replacing, altering, converting, modernizing, improving, or making of an addition to any real property primarily designed or used as a residence." (Emphasis added.) 815 ILCS 513/10 (West 2006). "'Home repair and remodeling' includes the construction, installation, replacement, or improvement of driveways, swimming pools,

porches, kitchens, bathrooms, *** plumbing fixtures, *** and other improvements to structures within the residence or upon the land adjacent to the residence."  815 ILCS 513/10 (West 2006).  Here, the building is located on Maine Street in a downtown business district, has three separate addresses for its three ground-level commercial storefront units, and commercial-grade plumbing.  The photographs introduced into evidence show large business signage above each entryway of the three storefront units, indicating businesses named "Dance Waves," "Art Academy," and "Gallery Outreˊ" had been or were presently housed there.  The photographs also showed commercial doors with steel trim, large storefront windows, the entryway to the storefront units have display cases on each side, and a sign on the unit that formerly housed Dance Waves indicating that unit was "for rent."  The record contains no photographs of the second and third floor.

In M.D. Electrical, 228 Ill. 2d at 291, 888 N.E.2d at 60, our supreme court stated that "it is clear that the statute unambiguously applies only to those who directly contract with a homeowner."  Here, plaintiff corporation did not contract with a homeowner as envisioned by the Act, but with the owner of a commercial building.  Because the building does not qualify as a "residence" within the meaning of section 10 of the Act, the work plaintiff performed cannot be "home repair and remodeling" since the work done was not to a "residence," a prerequisite to qualify as "home repair and remodeling."  Therefore, sections 15 and 20 of the Act relating to the requirements of a written contract and the consumer rights brochure, respectively, do not apply to this case.

We need not address plaintiff's contention the trial court erred by denying plaintiff's motion to reopen the evidence to allow plaintiff to introduce evidence purporting to support plaintiff's position that the building was not a residence.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

Reversed and remanded.

STEIGMANN and APPLETON, JJ., concur.